**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| OEG BUILDING MATERIALS, INC.,<br><br>Plaintiff,<br><br>v.<br><br>TATA INTERNATIONAL METALS (AMERICAS), LTD.,<br><br>Defendant. | No. 23 C 2962<br><br>Judge John F. Kness |

## MEMORANDUM OPINION

OEG Building Materials alleges that Tata International Metals (Americas), Limited, breached a purchase agreement by failing to properly apply corrosion-resistant coating to steel coils. Before the Court are Tata's motion for summary judgment (Dkt. 73) and Tata's *Daubert* motion (Dkt. 89), which the Court resolved by minute order (Dkt. 97) with the notation that a written opinion would follow. Accordingly, for the reasons that follow, Tata's motion for summary judgment is denied except as to Count IV. Tata's *Daubert* motion is denied.

## I. BACKGROUND

In August 2021, OEG and Tata executed purchase orders for fourteen batches of ASTM A653 G60 Grade 50 steel, one batch of ATSM A653 G40 Grade 33 steel, and one batch of ATSM A653 G40 commercial steel type B. (Dkt. 1-1 at 2–4.) "ATSM A653" refers to industry-standard galvanized steel. (Dkt. 78 at 4.) "G40" and "G60"

refer to the thickness of the zinc coating on the galvanized steel—G40 steel is coated in 0.40 ounces of zinc per square foot, and G60 steel is coated in 0.60 ounces of zinc per square foot, when measured using something called a triple-spot test. (*Id.*) G40 steel has 0.30 ounces of zinc per square foot, and G60 steel has 0.50 ounces of zinc per square foot, when measured using a single-spot test. (*Id.*) The metric equivalent of G60 is Z180, which is 180 grams of zinc per square meter. (*Id.*) The zinc layer on galvanized steel is designed to prevent corrosion, but it can wear off due to environmental factors such as humidity in the storage site. (*Id.* at 15–16.)

Tata sourced 366 steel coils from TatMetal, a manufacturer in Turkey, to fulfill the order. (*Id.* at 6.) When TatMetal fabricates galvanized steel coils, it dips the steel into a vat of zinc coating, and the relevant machinery is calibrated to apply the amount of coating requested in the purchase order. (*Id.*) When the steel is passed through the zinc bath, a machine checks the thickness of the zinc coating and removes some as needed to ensure the steel complies with the purchase order's specifications. (*Id.* at 6–7.) TatMetal then takes samples from each coil in the order and tests them to ensure that the proper amount of zinc coating is on each coil. (*Id.* at 7–8.) Those tests produce Mill Test Certificates (MTCs), and the MTCs for the coils at issue here facially reflect that the coils met the G60 and G40 standards. (Dkt. 72-9 at 7–26.)

In January 2022, Tata placed the steel coils on a ship bound for New Jersey; they arrived two months later. (Dkt. 78 at 8–9.) When the coils arrived in the Garden State, neither Tata nor OEG saw any visible defects in the coils, and OEG took possession of all of them. (*Id.* at 8–9.)

When OEG began using the steel in construction projects, however, customers noticed that rust had formed on the steel panels fabricated from the steel supplied by Tata. (*Id.* at 10–11.) Testing by OEG's expert allegedly reflects that the steel coils did not have enough zinc to meet the design specifications called for in the purchase orders. (Dkt. 72-12 at 7.)

OEG then brought this action against Tata for breach of contract, breach of the implied warranty of merchantability, breach of the implied warranty of fitness for a particular purpose, and unjust enrichment. (Dkt. 1 at 10.) After discovery, Tata moved for summary judgment, and both parties filed evidentiary motions. Those motions are addressed below.

## II. CHOICE OF LAW

Before turning to the parties' motions, a choice-of-law issue must be addressed. In diversity suits, federal courts apply federal law to procedural questions and state law to substantive questions. *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 427 (1996). Horizontal choice-of-law questions are substantive, *Land v. Yamaha Motor Corp.*, 272 F.3d 514, 516 (7th Cir. 2001), and evidentiary questions are procedural, *Lovejoy Elecs., Inc. v. O'Berto*, 873 F.2d 1001, 1005 (7th Cir. 1989).

Because this Court sits in Illinois, Illinois law ordinarily applies to substantive questions in diversity cases. *Protective Ins. Co. v. Montgomery Tank Lines, Inc.*, No. 89 C 2793, 1989 WL 152527, at *2 (N.D. Ill. Dec. 8, 1989); *Int'l Adm'rs, Inc. v. Life Ins. Co. of N. Am.*, 753 F.2d 1373, 1376 n.4 (7th Cir. 1985). And in the contract at issue here, a clause says that it "shall be governed by and interpreted in accordance with the laws of Illinois which are in force on the date of the contract." Dkt. 1-2 at 10.

In Illinois, a valid choice-of-law clause must be enforced, *see* 810 ILCS 5/1-301(a)[1]; *see also McAllister v. Smith*, 17 Ill. 328, 334 (1856), and "the parties do not dispute the validity of the choice of law provision"; Illinois law thus governs. *Darne v. Ford Motor Co.*, No. 13 C 03594, 2015 WL 9259455, at *4 (N.D. Ill. Dec. 18, 2015).

For reasons that are unstated, however, the parties have briefed this case under New Jersey law. (*See* Dkt. 74 at 4–5, 10–15; Dkt. 79 at 16–17.) It is unclear why the parties would do so after specifying Illinois law in their contract. More pertinently, the Court cannot accept this stipulation, as Illinois law does not permit parties to choose law by stipulation when applying that law would be "contrary" to the law that would be chosen "through the application of customary choice-of-law principles." *In re Marriage of Adams*, 551 N.E.2d 635, 638–39 (Ill. 1990). Those customary principles lead to the conclusion that an Illinois court would apply Illinois law here, meaning that the Court must apply the law of Illinois instead of New Jersey.

Although the Seventh Circuit previously suggested that the Supreme Court of Illinois would bless such stipulations, *see Twohy v. First Nat'l Bank of Chi.*, 758 F.2d 1185, 1190 (7th Cir. 1985), *Adams* has since resolved the issue, *see Reiser v. Residential Funding Corp.*, 380 F.3d 1027, 1029 (7th Cir. 2004). *Adams* foreclosed the parties' approach when it would contradict the choice-of-law rules of Illinois. 551 N.E.2d at 638–39. Either way, rejecting the parties' choice of law by stipulation is consistent with *Twohy*, which supposed that the Supreme Court of Illinois would

[1] The UCC governs contracts for the sale of goods. *See Sorce v. Naperville Jeep Eagle, Inc.*, 722 N.E.2d 227, 234 (Ill. App. Ct. 1999).

recognize *reasonable* choices of law by stipulation, 758 F.2d at 1190. But *Adams* explained that this type of stipulation was unreasonable, 551 N.E.2d at 639.[2] In short, therefore, the Court must, consistent with *Erie,* apply Illinois law to this case.

## III. EVIDENTIARY MOTIONS

When considering a summary judgment motion, the Court may consider only evidence that would be admissible at trial—except for hearsay, which can be admitted at summary judgment if the proponent can produce the evidence in admissible form at trial. *See, e.g.*, *Wheatley v. Factory Card & Party Outlet*, 826 F.3d 412, 420 (7th Cir. 2016). Before considering the parties' summary judgment arguments, the Court must therefore consider their three evidentiary objections.

### A. Tata's *Daubert* motion is denied.

Tata first asserts that OEG's expert, Dr. Kane, is not a valid expert under Rule 702 of the Federal Rules of Evidence. A witness who is qualified as an expert by "knowledge, skill, training, or education" may testify if

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. As explained by the Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the Court's decision to admit an expert's

---

[2] This is no mere academic frolic. Correctly choosing the applicable law is pertinent to substantive questions regarding the relevant contract; Tata's spoliation argument (Dkt. 74 at 9); and Tata's *Daubert*-based argument (the admissibility of evidence is governed by federal law, *Stollings v. Ryobi Techs., Inc.*, 725 F.3d 753, 767 (7th Cir. 2013)).

testimony or opinion is guided by three determinations: (1) "whether the witness is qualified"; (2) "whether the expert's methodology is scientifically reliable"; and (3) "whether the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue." *Myers v. Ill. Cent. R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010) (internal quotation marks omitted).

In determining the admissibility of proposed expert evidence, a court must consider the proposed expert's full range of experience and training in the subject area, as well as the methodology used to arrive at a particular conclusion. *Smith v. Ford Motor Co.,* 215 F.3d 713, 718 (7th Cir. 2000). Although it is imperative that the expert's opinion "be reasoned and founded on data," the reliability of an expert's methodology turns "primarily" on "the validity of the methodology employed by [the] expert, not the quality of the data used in applying the methodology or the conclusions produced." *Manpower, Inc. v. Ins. Co. of Penn.*, 732 F.3d 796, 806 (7th Cir. 2013) (citing *Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 894 (7th Cir. 2011)).

Under Rule 702, exclusion of expert testimony "is the exception rather than the rule." Fed. R. Evid. 702 advisory committee note to 2000 amendment. *Daubert* itself emphasized that "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." 509 U.S. at 596; *see also Stollings v. Ryobi Technologies, Inc.*, 725 F.3d 753, 765 (7th Cir. 2013); *Bielskis*, 663 F.3d at 894. An expert's credibility and "whether his or her theories are correct given the circumstances of a particular case" are "factual" questions that are "left for

the jury to determine after opposing counsel has been provided the opportunity to cross-examine the expert regarding his conclusions and the facts on which they are based." *Smith*, 215 F.3d at 719.

In other words, the Court is designated as the "gatekeeper" of expert testimony, but "the key to the gate is not the ultimate correctness of the expert's conclusions. Instead, it is the soundness and care with which the expert arrived at her opinion: the inquiry must focus . . . solely on principles and methodology, not on the conclusions they generate." *Schultz v. Akzo Nobel Paints, LLC*, 721 F.3d 426, 431 (7th Cir. 2013) (quoting *Daubert*, 509 U.S. at 595); *see also Smith*, 215 F.3d at 719.

Dr. Kane is a materials scientist with a Ph.D. from the University of Pennsylvania. (Dkt. 89 at 1; Dkt. 72-21 at 14.) Dr. Kane's "areas of technical expertise" include "root cause failure analysis" and "environmental degradation of materials." (Dkt. 72-21 at 14 (bolding and capitalization altered).) Dr. Kane has testified as an expert in over a dozen lawsuits, and he frequently writes on matters within his area of expertise. (*Id.* at 15.)

Dr. Kane determined that it was impossible for the steel at issue in this case to meet the requirements of G60 or G40 steel, because those types of steel would typically take between five and fifteen years to rust. (*Id.* at 7–8.) Dr. Kane drew this conclusion based on information from a materials science textbook and his review of the photographs of the steel coils. (*Id.* at 7–8; Dkt. 93 ¶ 8.) This methodology is one of the standard methods for analyzing the properties of the piece of steel. (Dkt. 93 ¶¶ 9–10.)

Dr. Kane satisfies the *Daubert* standard and is qualified to opine whether Tata properly manufactured the steel at issue in this case. Dr. Kane's testimony will be helpful because the average person would not know how long galvanized steel is supposed to last before it rusts. And there is no basis on this record for finding that Dr. Kane's method is so unreliable that it would be inappropriate to let the finder of fact hear it. To be sure, Tata counters by saying that Dr. Kane should have directly tested the steel or grappled more closely with contrary evidence (Dkt. 89 at 5–6), but those are matters for the finder of fact. *See Daubert*, 509 U.S. at 596. Tata's motion to exclude Dr. Kane's testimony is therefore denied.

**B. OEG's motion to exclude the MTCs is denied.**

OEG next objects to consideration of the Mill Test Certificates (MTCs) because they are, in OEG's view, inauthentic. Only authentic evidence, of course, is admissible. *See Fenje v. Feld*, 301 F. Supp. 2d 781, 809 (N.D. Ill. 2003), *aff'd*, 398 F.3d 620 (7th Cir. 2005); *Scott v. Edinburg*, 346 F.3d 752, 759–60 (7th Cir. 2003). To satisfy the requirement "of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a). This is a "minimal" burden, *United States v. Diaz*, 147 F.4th 809, 814 (7th Cir. 2025), and a party meets that burden if the evidence is self-authenticating under Rule 902 of the Federal Rules of Evidence, *see* Fed. R. Evid. 901(b)(10); *United States v. Hampton*, 464 F.3d 687, 689 (7th Cir. 2006) (self-authenticating evidence can be admitted "without any need for" additional evidence "that it is authentic").

In civil cases, a foreign business record is self-authenticating when (1) "the

record was made at or near the time by—or from information transmitted by—someone with knowledge," (2) "the record was kept in the course of a regularly conducted activity of a business," (3) "making the record was a regular practice of that activity," (4) the proponent provides "reasonable written notice of the intent to offer the record . . . so that the party has a fair opportunity" to make the objection, and (5) a records custodian testifies, on pain of perjury under the law of "the country where the certification is signed," that the document satisfies prongs one through three. Fed. R. Evid. 803(6)(A)–(C), 902(11), (12).

Tata has met these requirements. It has submitted an affidavit from a records custodian showing that the MTCs satisfy prongs one through three. (Dkt. 72-9 at 4–5.) That affidavit was signed on pain of penalties under article 272 of the Turkish Criminal Code, which is Turkey's perjury statute. (*Id.* at 5.) And the summary judgment briefing constitutes written notice that Tata wants to introduce them.

OEG does not contest any of that. Instead, it argues that the MTCs violate Rule 902(12) because they violate Rule 803(6)(E) of the Federal Rules of Evidence. But evidence does not need to satisfy Rule 803(6)(E) to be authentic under Rule 902(12). Instead, Rule 902(12) (through a cross-reference to Rule 902(11)) says only that the record must "meet[] the requirements of Rule 803(6)(A)–(C)." Fed. R. Evid. 902(11), (12). That the evidence may not be admissible under the business records exception to the hearsay rule does not mean that it is not an authentic foreign business record.

OEG's case law is inapposite. In *Khanna*, the court excluded the evidence

because of a “clear[]” “lack of compliance with Rule 902(12),” not because of the authenticity concerns it raised in a passing comment. *Khanna v. Randhawa*, No. C-07-5136, 2008 WL 11409005, at *7 (N.D. Cal. Aug. 13, 2008), *report and recommendation adopted*, 2008 WL 11408995 (N.D. Cal. Oct. 6, 2008). So too with the documents in *Seoul Semiconductor Co., Ltd. v. Bed Bath & Beyond, Inc.*, No. CV 18-3837, 2022 WL 17251954, at *5 (C.D. Cal. Aug. 23, 2022). And the court in *Mwangachuchu* rejected the business record because testimony supporting the authenticity of the document was not credible, not because the document itself was not trustworthy. *Mwangachuchu v. Comm’r*, 103 T.C.M. (CCH) 1466, at *4–5 (T.C. 2012). Credibility determinations are inappropriate at this stage. *See, e.g.*, *Reinebold v. Bruce*, 18 F.4th 922, 927 (7th Cir. 2021).

As to Rule 803(6)(E), the MTCs clear that bar. Rule 803(6)(E) renders a business record inadmissible hearsay if the opponent can “show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness.” Fed. R. Evid. 803(6)(E). In other words, the “document must have sufficient indicia of trustworthiness to be considered reliable.” *Murphy v. Caterpillar Inc.*, 140 F.4th 900, 908 (7th Cir. 2025) (quoting *Woods v. City of Chicago*, 234 F.3d 979, 988 (7th Cir. 2000)). At the summary judgment stage, a document will have those indicia if a records custodian testifies “from personal knowledge that the documents were admissible business records,” *Woods*, 234 F.3d at 988, and shows evidence of “systemic checking, habits of precision on the part of the keeper, reliance by others on the records, or a duty to record accurately,” *Murphy*, 140 F.4th at 908.

Tata's MTCs meet those requirements. Tata's witness testified (correctly) that American import/export regulations require steel importers to submit to Customs and Border Protection a document that states "the dimensional, surface, chemical and mechanical properties of the steel . . . being imported." (Dkt. 72-9 at 2.) *See* 19 C.F.R. § 141.89 (requiring steel importers to provide a "[s]tatement of the percentages by weight or carbon and any metallic elements contained in the articles, in the form of a mill analysis or mill test certificate"). Lying to Customs is a federal crime. *See* 18 U.S.C. § 1001. Other entities (including steel importers) rely on the MTCs, and Tata has a duty to accurately record the data on those certificates.

OEG contends that the MTCs must be fake because (1) the earliest the coils could have been made was January 6, 2022; (2) if TatMetal followed its typical practice, the coils would have been made on January 10 or 11; and (3) the shipping documents show that the coils were loaded onto the ship between January 3 and January 10, 2022, so (4) it is impossible for the MTCs submitted to be associated with the steel coils that OEG received because of a discrepancy with the dates. (Dkt. 79 at 9–10.) But business records "are presumed reliable," *United States v. Blackburn*, 992 F.2d 666, 670 (7th Cir. 1993), and OEG presents no evidence undermining the validity of the MTCs beyond this mere supposition.

OEG is welcome to argue to the fact finder that the MTCs are fake or should be given less weight. But the MTCs meet the requirements of Rules 803(6) and 902(12), so the Court is not going to exclude them at this stage.

### C. Tata's request for spoliation sanctions is denied without prejudice.

Tata argues that it is entitled to an adverse inference under New Jersey law that the steel coils contained evidence adverse to OEG's position because OEG destroyed some of the steel coils, depriving Tata of the ability to test them. (Dkt. 74 at 9–10.) As noted above, Illinois law governs this issue. But more importantly, an adverse inference is inappropriate this time.

Because OEG is the nonmovant on summary judgment, it is entitled to all reasonable inferences in its favor. *See, e.g.*, *Donald v. Wexford Health Sources, Inc.*, 982 F.3d 451, 457 (7th Cir. 2020). This means that the Court cannot indulge any inferences adverse to OEG, even if the finder of fact might be permitted to draw such an inference at trial. *See Malibu Media, LLC v. Winkler*, No. 13-CV-03358, 2015 WL 12550890, at *10 (D. Colo. June 25, 2015) (refusing to draw an adverse inference based on spoliation at the summary judgment stage), *report and recommendation adopted*, 2015 WL 4245820 (D. Colo. July 14, 2015); *see also In re 650 Fifth Ave. & Related Props.*, 830 F.3d 66, 93 n.25 (2d Cir. 2016) (rejecting an adverse inference based on the Fifth Amendment at summary judgment). Tata's request for an adverse inference is thus denied without prejudice to renewal before trial.

## IV. TATA's MOTION FOR SUMMARY JUDGMENT

Having addressed the necessary preliminary matters above, Tata's motion for summary judgment must now be considered. As the parties agree, Tata is entitled to summary judgment on Count IV (*see* Dkt. 86 at 18), and the motion is thus granted in that regard. Tata's motion is denied in all other respects.

Summary judgment is warranted only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Jewett v. Anders*, 521 F.3d 818, 821 (7th Cir. 2008) (quoting *Magin v. Monsanto Co.*, 420 F.3d 679, 686 (7th Cir. 2005)); *see also* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). Rule 56(c) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. As the " 'put up or shut up' moment in a lawsuit, summary judgment requires a non-moving party to respond to the moving party's properly supported motion by identifying specific, admissible evidence showing that there is a genuine dispute of material fact for trial." *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017) (quotations omitted).

Counts I through III allege breach of contract, breach of the implied warranty of merchantability, and breach of the implied warranty of fitness for a particular purpose, respectively. (Dkt. 1 at 8–10.) Although these are framed as three distinct duties, they are three different ways of saying that Tata did not put enough zinc on the steel.[3] Implied warranties are terms deemed part of any contract as a matter of

[3] Tata asserts that OEG waived these claims by judicial admission. (Dkt. 74 at 3 n.3.) But that argument, coming as it does "with no citation or discussion of federal authority," *Keller v. United States*, 58 F.3d 1194, 1198–99 (7th Cir. 1995), is not well taken. In any event, OEG did not make a judicial admission. Judicial admissions "are formal concessions in the pleadings, or stipulations by a party or its counsel, that are binding upon the party making them . . . . To be binding, a judicial admission must be a deliberate, clear, and unequivocal

law, *see* 810 ILCS 5/2-314(1) (warranty of merchantability is "implied in a contract for" the sale of a good); 810 ILCS 5/2-315 (same for fitness for particular purpose), so alleging breach of an implied warranty is just another way of alleging a breach of the underlying contract, *see 933 Van Buren Condo. Ass'n v. W. Van Buren, LLC*, 61 N.E.3d 929, 945 (Ill. App. Ct. 2016) ("[T]he claim at issue in this case, based on the implied warranty of habitability, is a contract claim.").

There is a genuine dispute of material fact as to those three claims. OEG's expert, Dr. Kane, asserts that "the Tata Steel did not meet the specifications in OEG's purchase order." (Dkt. 72-21 at 7 (bolding and capitalization altered).) For its part, Tata has presented documents showing that the steel had the correct amount of zinc. (Dkt. 72-9 at 7–26.) It is up to a jury to determine who is correct.

Tata's argument that OEG waived its merchantability claim fails. (*See* Dkt. 74 at 11.) Although a plaintiff cannot rely on that implied warranty when "an examination ought in the circumstances to have revealed" the defect, 810 ILCS 5/2-316(3)(b), the coatings at issue here are fractions of an inch thick (*see* Dkt. 78 at 4). Tata presents no evidence that a reasonable person could have noticed that the coatings were too thin with a dock-side inspection.

Finally, there is a genuine dispute of material fact on the particular-purpose claim. OEG presented evidence that it "told Bertan," a sales representative with Tata,

---

statement." *Neita v. City of Chicago*, 148 F.4th 916, 927 (7th Cir. 2025) (quoting *Keller*, 58 F.3d at 1198 n.8) (citing *Medcom Holding Co. v. Baxter Travenol Lab'ys, Inc.*, 106 F.3d 1388, 1404 (7th Cir. 1997)) (cleaned up). And judicial admissions have the effect "of withdrawing *a fact* from contention." *Id.* (quoting *Keller*, 58 F.3d at 1198 n.8) (emphasis added). The testimony at issue was equivocal and was a statement related to a legal theory; it was not a judicial admission.

that it "buys raw steel coils and unrolls/forms the steel into steel roof deck to sell in the construction industry" and that its "products need to be resistant to . . . rain and snow." (Dkt. 79-2 ¶¶ 4(a)–(b), 6–7.) OEG has thus created a genuine dispute of material fact on the particular-purpose claim. *See Kirk v. Stineway Drug Store Co.*, 187 N.E.2d 307, 310 (Ill. App. Ct. 1963) ("The factual requirements of an implied warranty of fitness for a particular purpose are that the buyer makes known to the seller the purpose for which an article was purchased and that it appears that he relied on the seller's skill or judgment."). Whether that testimony is credible is a question to be addressed at trial.

## V. CONCLUSION

For these reasons, the motion for summary judgment (Dkt. 73) is granted as to Count IV and denied in all other respects. The *Daubert* motion (Dkt. 89) and the motion to exclude evidence as inauthentic (Dkt. 79 at 8–10) are denied. The motion for spoliation sanctions (Dkt. 74 at 9–10) is denied without prejudice.

SO ORDERED in No. 23 C 2962.

Date: November 17, 2026

JOHN F. KNESS
United States District Judge